**AMERICAN FRIENDS SERVICE
COMMITTEE et al.**

v.

**William H. WEBSTER et al.**

**Civ. A. No. 79–1655.**

United States District Court,
District of Columbia,
Civil Division.

Jan. 10, 1980.

Alan Dranitzke, Washington, D. C., Marshall Perlin, New York City, for plaintiffs.

Lynne K. Zusman, Asst. U. S. Atty., Dept. of Justice, Washington, D. C., for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

This is an action to enjoin the disposal of records of the Federal Bureau of Investigation. Plaintiffs are individuals and organizations which claim that the FBI's record destruction program violates various laws and interferes in a number of respects with their rights and interests. The defendants, officials of the National Archives and Rec-

ords Service (NARS)[1] and of the Federal Bureau of Investigation, claim that the Court lacks jurisdiction; that plaintiffs have no standing to bring this action; and that the records destruction program is being carried out as a housekeeping measure, strictly in accordance with law, with a purpose to eliminate from storage obsolete documents and files. Presently before the Court are defendants' motion to dismiss and plaintiffs' motion for a preliminary injunction. Voluminous memoranda and other documents have been filed with the Court, and an evidentiary hearing has been held.

I

The government's contentions regarding jurisdiction and standing may be disposed of summarily.

■ The government argues that the Court lacks jurisdiction over the subject matter of the complaint because the various records management statutes (see Part II *infra*) do not create private rights of action enforceable in the courts. However, in the cases relied on by the government in support of that argument,[2] the private remedy issue arose because both plaintiffs and defendants were private parties and no official misconduct was alleged. The present suit, on the other hand, involves various governmental entities and officials who are claimed to have violated their statutory duties. In that context it is largely irrelevant whether the various records management statutes create a private remedy: where governmental action is being challenged, absent other, specific methods for bringing about judicial consideration, the question is whether review of the challenged agency action is available under the Administrative Procedure Act.

---

1. Responsibilities relating to the retention and disposal of records are now and have in the past been exercised by the Archivist of the United States, NARS and, since 1970, by the General Services Administration. P.L. 81–152. For the sake of clarity, and unless otherwise required, all these agencies will hereinafter generally be collectively referred to as the Archivist or the Archives.

2. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 650 (1979); *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979); *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

■ Sections 10, 10(a), and 10(e) of that Act, 5 U.S.C. §§ 701, 702, 706, provide that the action of an administrative agency is subject to judicial review unless a statute precludes review or the matter is by law committed to agency discretion. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1975). None of the records management statutes expressly or impliedly precludes review of the actions of either the Archivist or the FBI, nor are the actions of the officials of these agencies "committed to agency discretion" as that term is properly understood. Official actions are deemed to be committed to discretion when the statutes involved "are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park v. Volpe, supra*, 401 U.S. at 410, 91 S.Ct. at 821. The records management laws contain specific standards and directives with respect to record preservation which the administrators are required to follow, and there clearly is "law to apply." Thus, review is available under the Administrative Procedure Act to determine whether the official actions were arbitrary or capricious, constituted an abuse of discretion, or failed to meet statutory or procedural requirements, and the Court has jurisdiction under 28 U.S.C. § 1331.

There is likewise no merit to defendants' standing argument.

■ It is settled that a party has standing to sue if (1) a case or controversy exists, that is, if the parties have a sufficiently personal stake in the outcome and are able to demonstrate that they have suffered in-

jury in fact, and (2) there is a fairly traceable causal connection between the claimed injury and the challenged conduct, such as where the claims asserted are within the zone of interests protected or regulated by the statutes involved.[3]

The plaintiffs in this litigation fall basically into three categories: (1) individuals and organizations whose claimed need for FBI documents arises out of their professions as historians, journalists, teachers, film writers, or attorneys; (2) individuals who, as subjects of FBI investigations or alleged victims of FBI activities, claim to have suffered legal wrongs, and (3) organizations whose goals and purposes are alleged to require access to the files and records of the FBI in order to enable them to disseminate information for organizational, educational, and political purposes.

■ Plaintiffs in the first category have in the past made requests for FBI documents under the Freedom of Information Act, 5 U.S.C. § 552 et seq., but such documents reportedly were destroyed notwithstanding such requests; they have similar requests for documents pending now; and they assert that they intend to request additional FBI files in the future. These plaintiffs have a need for such documents and files in order to carry out research in their respective professional fields,[4] and they will suffer concrete and personal damage if the destruction of the documents is allowed to continue. It may be that the asserted damage to their career pursuits rises to the level of economic harm which has been the traditional test of standing to sue; but at a

---

**3.** This provides the necessary concreteness for the exercise of the judicial power. *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Barlow v. Collins*, 399 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 261, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–2, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1973).

**4.** See, *e. g.*, testimony and affidavits of Harold Fruchtbaum, associate professor of history and philosophy of public health at Columbia University; John S. Rosenberg, writer and historian; Blanche Weisen Cook, associate professor of history at the City University of New York; Victor Navasky, author and editor; Frank J. Donner, attorney and author; Robert and Richard Meeropol, sons of Julius and Ethel Rosenberg, who are teachers, writers, and lecturers; John Anthony Scott, historian, writer, and teacher.

minimum it is equivalent to the type of non-economic injury recognized by the Supreme Court in *United States v. SCRAP*, 412 U.S. 669, 686, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1972)[5] as sufficient for standing purposes.

■ The second category of plaintiffs—those who are or have been the subject of FBI investigations and have requested or intend to request FBI files[6]—may have suffered actionable legal wrongs by virtue or as a consequence of those investigations. Their interest in the preservation of the documents relates to the possibility that, through FOIA requests, they will discover the evidence necessary for legal action to remedy these alleged wrongs. They are harmed by an inability to obtain the FBI documents relating to their particular claims, and accordingly they have the requisite stake in this action.

■ The injury claimed by the third group of plaintiffs for standing purposes is more questionable. That group consists of organizations[7] which assert that their activities include the furtherance of civil liberties; civil rights; social, cultural, and economic change; and world peace.[8] These organizations, suing in their own behalf and on behalf of their members, claim to have a need for access to FBI files under the FOIA to pursue their various goals, and they contend that if the files are destroyed, they will be deprived of raw material for primary research in the areas of their activities.

It is unsettled whether the requisite injury-in-fact standard is met by a claim that government documents, earmarked for de-

struction, are needed for organizational political purposes. However, it is not necessary to decide that question here because even if the organizations in this category of plaintiffs have failed in that regard, the plaintiffs in the other groups have adequately shown injury for standing purposes.

All the plaintiffs satisfy the second prong of the standing test—that the claimed rights must be within the zone of interests protected and regulated by the statutes at issue, and that there be a fairly traceable causal connection between the claimed injury and the challenged conduct. As noted, the various laws here involved govern the creation, preservation, maintenance, and disposal of federal records. These laws are designed primarily for the orderly management of government files, but among their other important purposes is the preservation of documents which may be of use to private citizens. In that respect, the three categories of plaintiffs who seek information about agency action that affects or has affected them are within the zone of interest protected by these laws, and their claimed injury is directly traceable to the conduct of defendants. Thus, these plaintiffs, or some of them, have standing to maintain this action.

Accordingly, the Court must turn to the merits of plaintiffs' claims. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 180 U.S.App.D.C. 88, 559 F.2d 841, 843 (1977); *Virginia Petroleum Jobbers Assn. v. Federal Power Commission*, 104 U.S.App.D.C. 106, 259 F.2d 921, 925 (1958).

---

5. In that case, the Court stated that aesthetic or environmental injury was sufficient to confer standing.

6. See, *e. g.*, the affidavit of Alan McSurely and that of Jonathan W. Lubell on behalf of a former member of the Black Panthers.

7. Requirements for organizational standing are similar to those for the standing of individuals. *United States v. SCRAP, supra.*

8. Plaintiffs in this category include the American Friends Service Committee, the Women's International League for Peace and Freedom,

Interreligious Foundation for Community Organization, Inc., Alliance to End Repression, American Indian Movement, National Security Studies, Historians for Freedom of Information, Project for Open Government of the Fund for Constitutional Government, Nation Associates, and the National Committee Against Repressive Legislation. Some of these organizations also claim to have a need for the documents, for themselves or their members, for professional and occupational purposes, and to that extent they have standing as part of the first category of plaintiffs.

## II

Maintenance and disposal of the records of the United States government is governed by a series of laws codified in title 44 of the United States Code. The Archivist of the United States, under the administrative direction of the General Services Administration,[9] has overall responsibility for the management and disposal of governmental records. His duties and those of the various agencies which generate, collect, maintain, and dispose of records, are set forth in the Archival Administration Act (44 U.S.C. § 2101 et seq.); the Records Management by Federal Agencies Act (44 U.S.C. § 3101 et seq.); the Disposal of Records Act (44 U.S.C. § 3301 et seq.); and various regulations promulgated pursuant to these laws.

These statutes contemplate and require the preservation *inter alia* of the following categories of records: (1) those which contain "documentation of the organization, functions, policies, decisions, procedures, operations, and essential transactions of an agency" (sections 3101, 3301); (2) those having "sufficient historical or other value to warrant their continued preservation" (section 2103); (3) those which are necessary to protect the financial and legal rights of persons directly affected by an agency's activities (section 3101); and (4) those which have sufficient "administrative, legal, research, or other value to warrant their further preservation" (section 3303).

Pursuant to these general substantive guidelines, the Archivist is charged by law with the duty to establish records management standards, procedures, and guidelines, as well as the more specific responsibility to set standards for the selective retention of records of continuing value (sections 2901, 2902, 2904). He must also promulgate procedures for the disposal of records authorized to be destroyed (section 3302). The various agencies, in turn, are required to cooperate with the Archivist in applying these standards, procedures, and techniques (section 3102) and to submit to him lists and schedules of records proposed for disposal. The Archivist examines these schedules and lists in order to determine whether the documents have such value as to warrant their preservation under the law (sections 3302, 3303a).

The Archivist has issued detailed regulations to implement these statutory directives. The regulations require the establishment with respect to each agency of records retention plans and records control schedules (41 C.F.R. § 101–11.401–1, 403–2(c)),[10] the maintenance of inventories of the records in the custody of an agency, and periodic inspections by the Archivist to insure that permanent records are being maintained (section 101–11.403–4(e)). Schedules submitted by an agency requesting authority to destroy records must be appraised by the Archivist for possible research or historical value (section 101–11.406–3). After such review, the Archivist determines whether the records are disposable, and if they are, he permits their destruction (section 101–11.406–5).

The evidence before the Court shows that the Archivist and those under his supervision have failed for a period of over thirty years adequately to carry out these statutory and regulatory responsibilities with respect to the records of the Federal Bureau of Investigation.

---

9. See 44 U.S.C. §. 2905, 41 C.F.R. § 101–11.-403–1 (1978). Many of the duties assigned to the Administrator of GSA in the statute have been delegated to the Archivist and to NARS. 41 C.F.R. § 101–11.401 et seq.

10. Records retention plans are developed by the Archivist. They focus on classes of records which have permanent value or are of continuing value (§ 101–11.403–3). Records control schedules, which are based on these plans, are developed by each operational agency (§ 101–11.401–3) for all its records. The schedules more specifically designate classes of records to be destroyed, timetables for disposition, and records to be retained, all in accordance with the plans. Although under the regulations the Archivist has primary responsibility for development of the retention plans, the agencies cooperate with him in their development.

The Archivist took action with respect to FBI records on four occasions[11] during that thirty-year period. A records disposal request was approved by the Archives in 1946. That approval granted authority to the FBI to destroy all closed field office files, the theory being that these files were mere duplicates of the records being maintained at FBI headquarters. No further guidelines were issued by the Archives until 1969, when the agency promulgated a new plan purporting to establish document retention standards and providing that FBI records officers would identify the specific series of files to be retained.[12] Thereafter, in 1975 and 1976, the FBI requested authority to dispose of certain field office files and both of these requests were promptly granted.[13]

During that entire period, neither in connection with the approval of the various plans and schedules nor during the interim years[14] did a single employee of the Archives see a single FBI file. All decisions were made on the basis of representations of the FBI—representations which, as noted below, were in some respects incorrect, and in all respects unverified.

 Some of the employees of the Archives having responsibility for appraising FBI record retention and destruction plans testified that they were capable of passing on such plans without ever having seen any of the documents involved, whether by category, by type, or by sample. The Court finds those representations to be wholly incredible.[15] The law imposes upon the Archivist and his staff important responsibilities concerning the selection of what, among the files of an agency, may have permanent or continuing value for historical, research, legal rights, and other purposes. It strains credulity to accept the proposition that such decisions can be made wholly by remote control.[16] The far more plausible explanation for the failure of the archival authorities to inspect the documents on which they were passing judgment—as several government witnesses candidly conceded—is that the FBI, in accordance with the policies established by its then Director J. Edgar Hoover, was not in the habit of granting to anyone outside the FBI access to its files; that the employees of the Archives were aware of this policy; and that in view of what they regarded as the futility of making access demands they did not even attempt to conduct personal inspections of the FBI's records.[17]

11. Additionally, there were several minor actions concerning the destruction of administrative materials.

12. That plan again did not recommend the permanent retention of field office files.

13. The 1975 action authorized the destruction of field office files after a ten-year retention period if no prosecutive action had been taken, the perpetrators were unidentifiable, or the investigation was beyond the jurisdiction of the FBI. The 1976 authorization broadened the previous disposal schedule to include the destruction of closed field office files which contained investigative reports and other related materials. Neither of these actions was actually implemented because of a moratorium imposed pursuant to a Senate Resolution (S.Res. 21, 94th Cong., 1st Sess.), 121 Cong.Rec. 1432 (1975), which enjoined destruction of such records. The moratorium remained in effect until August 15, 1977. In June of that year, the Attorney General authorized the recommencement of the destruction program, the Archivist gave his approval on August 15, 1977, and the field offices were authorized to proceed with destructions as of October 18, 1977 (except for records in litigation and those records which the Senate Select Committee on Assassinations had asked to be retained).

14. Archives has a continuing inspection responsibility. 41 C.F.R. § 101–11.403–4(e).

15. Even James E. O'Neill, Archivist of the United States, testified that examination of the files being evaluated was "preferable" and "desirable."

16. See, e. g., the testimony of William Appleman Williams who stated that such decisions cannot be made without review of documents by historians or archivists.

17. The Archivist of the United States and other government witnesses testified at length about the procedures they follow, and they emphasized the professionalism of the staff. However, at least in the context of the FBI files, for reasons of lack of access to the files, the inadequacy of the staff for the vast amount of work required, or both, in practice that staff exercised no independent professional judgment.

It was only in 1978, as a result of media and congressional interest concerning this problem, that two or three Archives employees visited FBI headquarters and several field offices to inspect, at least in part, some seventy-six files. But even that inspection was limited to records which FBI personnel had preselected (after the Archives employees had designated the general areas in which they wished to conduct audits).

 It is thus clear that the Archivist never discharged his statutory responsibility to make independent judgments concerning the record retention and destruction practices of the Federal Bureau of Investigation. This neglect, without more, fatally flaws the legality of any further destruction of records by the FBI: the Bureau's records disposal program, never having been considered and passed upon in any meaningful way by the Archives, cannot continue to be implemented consistently with the statutory mandate that records may be destroyed only pursuant to standards and procedures promulgated and approved by the archival authorities.

In the absence of an independent review, there is no guarantee, or any reason to believe, that the program is being carried out in accordance with the will of Congress as expressed in the records management laws. The Congress concluded that its objectives could not be met by records retention and disposal programs administered by the operational federal agencies acting alone.[18] The evidence here shows an abdication by the Archives of its responsibility to oversee that administration.

Nor was failure to inspect records the only evidence of archival neglect. For example, the Archivist and his staff also failed to conduct critical examinations of the schedules submitted to him to ascertain whether, by the FBI's own descriptions, records were being retained in accordance with the standards imposed by law. The FBI submissions were generally so brief and conclusory in nature as to be of little value for genuine decision-making purposes. Nevertheless, the Archives never requested explanations or details.

Likewise, no effort was made to require the FBI to submit the very minimal forms required under the regulations. The 1969 records retention plan included a section, a so-called Part II, which was to have been a compilation by the FBI of specific series of files included under the various broad categories described in Part I. The completed Part II was not returned by the FBI to the Archives until 1976, about seven years later,[19] and even then it was incomplete.

The reality of the situation is that between 1946 and 1976, a period of thirty years, when the FBI was experiencing an unparalleled growth in personnel and importance,[20] it was operating its records retention and disposal programs without the archival supervision and guidance required by the law. Further, as will be discussed below (p. 232), it was doing so under plans that were based on at least two premises that on examination have turned out to be false—that headquarters files were duplicates of the field office files; and that the FBI, on its own, was preserving not only records suited to its own bureaucratic and operational needs but also records useful for historical and other research and for the safeguarding of legal rights.

### III

 Defendants suggest that, whatever may have been the deficiencies in their procedures in the past, the records control schedule they adopted in 1977[21] satisfies

18. See 44 U.S.C. §§ 2901–2904, 3102, 3302–3303.

19. It was claimed by Archives witnesses that they had access to this document on the FBI premises.

20. Much of the increase in the FBI's security and applicant checking duties occurred during that period.

21. That schedule contains descriptive categories of both field office and headquarters files and it proposes a timetable for disposing of present and future records. It has been approved by the Archivist but has not become

their obligations under the law, and that court intervention is unwarranted. That contention is not well taken, for several reasons.

First. The 1977 schedule, like the previous plans and schedules, was developed without any review of FBI documents, and thus for that reason alone there could have been no valid determination whether the categories of records with which the schedule deals have or lack historical value or any of the other characteristics the law deems decisive for retention purposes.

Second. In the 1977 schedule the Archivist once again deferred to the FBI insofar as decision-making was concerned.[22] That schedule provides for the retention of headquarters files if they meet one of five designated criteria. However, all of these criteria are excessively and unnecessarily[23] vague. As the schedule itself notes, "the criteria is [sic] general in nature and the selection is basically a matter of informed judgment." The process which it established relies upon the judgment of FBI clerks to determine what documents will be exempt from destruction as having historical or other legally-protected value. But non-professional FBI personnel, whatever their good intentions or their experience in administration or law enforcement, cannot be expected to make such decisions consistently with the exacting statutory standard. Such persons, moreover, are unlikely to be careful to preserve documents which might

unfavorably reflect on their own agency or constitute a basis for legal claims against it.

Third. The 1977 schedule explains that "destruction resulting from this disposal will not compromise current authority granted for the destruction of field records." What this apparently means is that the 1975, 1976, and 1977 disposal plans remain unaffected, and that field office files may still be destroyed in reliance on these plans notwithstanding the fact that they were based on the assumption that the headquarters files duplicate the field office records. See p. 232 *infra*.

In short, the 1977 schedule, despite some cosmetic changes, does not correct the flaws of previous Archives-FBI understandings and decisions.

### IV

None of the parties to this litigation, except the FBI, has had an opportunity to make a study of that agency's records,[24] and none, again except the FBI, ever saw any of its records before they were destroyed. For that reason, it is not possible to document fully the tangible harm done as a consequence of the failure of the government to implement the requirements of the law. The evidence does permit the drawing of certain inferences in that regard, however.

The present focus of plaintiff's complaint are the FBI's field office files.[25] A great deal of evidence was adduced by both par-

---

effective because pursuant to statute (44 U.S.C. § 3303a) it was submitted to Congress for review. Congress has yet to act on the submission but the executive agencies are legally free to implement it without congressional action. The schedule provides for the destruction of about forty per cent of the current headquarters files of the FBI.

**22.** As indicated in Part V *infra*, an appropriate record disposal program need not and should not exclude the FBI; but personnel from that agency must operate under more than the pro forma direction from the Archives.

**23.** For example, the schedule provides for retention of files in which the investigation "directly involves a person, element, or organization whose activities are deemed to pose a substantial and compelling threat to the conduct of national defense or foreign policy."

The FBI's central records system contains 191 classifications of files based on the type of crime involved, a number of them relating to national defense or foreign policy. The 1977 schedule fails to utilize these classifications to define more specifically the criteria for retention of files.

**24.** Except for the Archives' inadequate examination in 1978.

**25.** Although the complaint refers to both the field office and the headquarters files, the evidence adduced at the hearing on the motion for preliminary injunction dealt primarily with the field offices, presumably because no destruction of headquarters files is currently taking place. The motion for preliminary injunction is addressed to both sets of records.

ties concerning the extent to which the Bureau's headquarters files do or do not duplicate the records in the several field offices. While, as noted above, the Archives has until recently proceeded on the assumption that the two sets of records were to all intents and purposes identical, the evidence clearly shows this to be erroneous.[26]

Raw investigative data—such as surveillance logs, wiretap records, verbatim informant evidence, and the like—are ordinarily maintained solely in the field offices, and only summaries of the information are forwarded to and kept at headquarters. In a very real sense, insofar as historians and other investigators are concerned, the field office files would be the stuff of primary research, at least in the areas of how and why FBI investigations are conducted (as distinguished from the ultimate decision-making process). Similarly, those who claim that their legal rights were violated by FBI investigative practices are far more likely to find evidence to sustain those contentions in the field office files (where the logs evidencing investigative techniques are kept) than at headquarters. Destruction of the field office files thus of necessity entailed violations of the substantive standards and purposes of the records management statutes.

Instructions were, to be sure, given to field office personnel that all important—or "pertinent" as one witness phrased it—information was to be forwarded to headquarters, and there is no reason to believe that these instructions were not carried out. But the problem with this approach is that it was, and still is, focused solely on usefulness to the FBI. As the government's witnesses conceded, what was important to the FBI were records which would assist headquarters in its law enforcement and decision-making functions. No effort was made at any time to forward to headquarters data which might be regarded as useful or significant in other respects; e. g., records having historical or research value, documents bearing on the legal rights of individuals, or records which might reflect unfavorably on the Bureau, its personnel, or its practices.[27] (One consequence of this selectivity has been that the field office files on any particular subject typically exceed in volume those kept at headquarters by a ratio of four or five to one.) The destruction of the field office records in these areas has meant, and unless present disposal plans are halted will continue to mean, the unavailability of the information contained in such documents for all time.

Nor are these the only "substantive" results of the failure of the Archives to implement the responsibilities vested in it by the Congress. The Archivist did not stop, indeed he acquiesced in, FBI measures to escape the burdens of the Freedom of Information Act by disposing of some of its files. The effective date of the FOIA (February 19, 1975) was followed within two months by an FBI request for the destruction of field office files, and that request was promptly granted. Thereafter, in the summer of 1976, Archives and FBI personnel began to confer regarding possible policy changes in the records retention area. These conferences, which ultimately led to the adoption of the 1977 schedule, were motivated at least in part by the problems the agencies felt they had with the FOIA, and that Act was repeatedly mentioned during the discussions as a significant factor.

---

**26.** The Archives' ignorance of the true situation may be attributed to its failure to exercise its independent audit responsibilities.

**27.** If, for example, someone were researching the circumstances of the FBI's investigation of Dr. Martin Luther King, or the Rosenbergs, what he could secure from the headquarters files would be limited to summaries and conclusions. Inasmuch as the completeness of the headquarters summaries varies in proportion to the notoriety of the person or incident being investigated, this would be even more true with respect to research on less well-known figures. In any event, the field office files would be far more likely to reveal the actual surveillance methods used, the duration of particular methods of surveillance, possible deviations from prescribed standards, and the like.

It is not necessary to accept plaintiffs' contention that records were sought to be disposed of to prevent the detection of FBI improprieties through FOIA requests and disclosures. It appears likely that the agencies' concerns were more modestly limited to minimizing the administrative difficulties involved in handling such requests. Even so, it is clear that the FOIA influenced the drafting of the 1977 schedule and reflected a bias, on impermissible grounds, in favor of the destruction rather than the preservation of governmental records.

The Court concludes on the basis of all the evidence that current document disposals contravene both the procedural directives and the substantive purposes of the record management laws, and that plaintiffs[28] have demonstrated that they are likely to prevail on the merits of their complaint.

### V

Under *WMATA v. Holiday Tours, Inc.,* supra, and *Petroleum Jobbers Assn. v. FPC,* supra, the Court must consider next the relative injuries and the public interest.

Plaintiffs are seeking an order which would restrain the FBI from the further destruction of any of its records, direct that the Bureau submit to the Court an inventory of all its files and records, and provide for a special master to be appointed by the Court to insure the completeness of the inventory and the preservation of the files pending their eventual delivery to the Archives.[29]

There is no need to consider relative injuries with regard to the most far-reaching aspects of the relief sought by plaintiffs, for they have not shown an entitlement to such relief on any basis. There is no indication that, except for its institutional reluctance to permit anyone not employed by the FBI to have access to its records, and the relatively isolated instances with respect to the Freedom of Information Act, the FBI has been acting with deliberate intent to frustrate statutory directives. Certainly no such purpose can be laid at the doorstep of the Bureau's present leadership. For that reason, the Court will not, through the submission of inventories, the appointment of a special master, or otherwise, assume direct or indirect control of the FBI's files.

At the same time, plaintiffs have demonstrated a sufficient likelihood that the records management laws have not been complied with that the Court must consider whether, with respect to the remainder of the relief requested, defendants would be more substantially injured by the grant of an injunction or plaintiffs by its denial.

Upon the basis of the evidence summarized in the preceding portions of this Opinion, it is clear that plaintiffs will suffer significant, irreparable injury if defendants' continuing destruction of FBI files is not enjoined. The destruction program as presently conducted is not in compliance with law. Numerous witnesses have testified

---

**28.** As detailed in Part I *supra,* plaintiffs, or some of them, have a legitimate interest in the preservation of these records. Additionally, insofar as specifically the field office files are concerned, the evidence shows the following. Katherine L. Camp, of the Women's International League for Peace and Freedom, has made FOIA requests for documents which can only be found in field offices. Victor Navasky, editor of the *Nation* magazine, testified that his magazine depends to a significant part upon the production of FBI records, many of them available only in field offices. William Appleman Williams, a historian, stated that the field office records are the primary evidence of historical research and thus essential to anyone doing serious historical research. Harold Fruchtbaum, professor of history and philoso-

phy, who is conducting research on the role of scientists in the Rosenberg case, stated that he has relied on a sizeable quantity of documents that came from the field offices, including surveillance files on scientists and others. Paul Robeson, writer and lecturer, has relied on and expects to need in the future documents from the field office files in writing a book on his parents and detailing the government surveillance of them. John Rosenberg, who is completing a book on Clifford Durr, has relied extensively on field office files and has a continuing need for access to them.

**29.** As part of their request for permanent relief, plaintiffs are asking that all FBI files be made permanent records of the Archives.

that the files which continue to be disposed of contain historical, research, and other information of potential value to these plaintiffs in their various capacities. Denial of an injunction to halt the disposal program in these circumstances would irreparably injure plaintiffs.

▇ Defendants argue that significant weight should be given to their interest in minimizing the logistical and the financial costs associated with the storage of records. In their view, any requirement that the record disposal programs be suspended permanently would impose a very heavy burden upon them, especially if the suspension were to be projected on a government-wide basis.[30]

The permanent and the government-wide aspects of defendants' argument may be laid to one side. As will be seen *infra*, the Court does not envision a permanent ban on the disposal of FBI records but merely a pause of sufficient duration to give defendants an opportunity to formulate, adopt, and implement disposal plans and schedules that meet the requirements of the law.

▇ As concerns the question of the scope of relief beyond the records of the FBI, the short answer is that the present action concerns only that agency. Even if it be assumed that the Archives is no more conscientious in discharging its statutory responsibilities with respect to other agencies and bureaus than it has been with regard to the FBI,[31] it does not follow that identical relief would be appropriate with

respect to them and their files. For the reasons described below, the FBI's relationship to this country's history and the legal rights of its citizens is unique, and the intensity of the scrutiny to which its files should be subjected before they are authorized to be destroyed must reflect that uniqueness.

▇ More broadly, it is clear that the interest of the government in minimizing the costs and administrative burdens associated with the storage of what it regards as unneeded and unwanted documents cannot be deemed to outweigh the interest of plaintiffs in the preservation of records which may be of substantial economic and other value to them. The basic judgment in that regard was made by the Congress. By enacting the various records management laws, it made a decision that the administrative and financial problems associated with archival review as a prerequisite to record disposal must take second place to the necessity for such review as a means for preserving documents which may have certain specified values. It is also useful to recall in this connection that the FBI, either on its own initiative or upon prompting by the Attorney General or the Congress, has operated for substantial periods of time on the basis of several moratoriums on the destruction of records,[32] all without disastrous consequences for its operations.

The Court concludes that the imposition of a judicially-imposed moratorium on the further destruction of FBI files [33] until sat-

---

**30.** Seven million cubic feet of records are generated by the federal government per year. The FBI alone generates some 400,000 pages of documents per day.

**31.** That assumption is not necessarily accurate, however, for few, if any, other agencies are likely to have been as guarded about their records as the FBI under its former director.

**32.** At present, the FBI on its own, or at the direction of the Attorney General, is operating under a moratorium on the destruction of headquarters files and those field office files which relate to national security investigations. These moratoriums were declared as a consequence of pending or anticipated discovery requests in prosecutions involving former FBI officials. *United States v. Kearney*, 436

F.Supp. 1108 (S.D.N.Y.1977); *United States v. Gray* and *United States v. Miller and Felt* (D.C. Crim. No. 78–179). Additionally, there is a moratorium in effect on a limited number of files at the request of the Senate Committee on Intelligence Activities (the so-called Church Committee). All of these moratoriums are voluntary on the part of the FBI and, absent a court order, may be ended at any time by the FBI's unilateral action.

**33.** The immediate practical effect of such an order is only to halt the disposal of field office files relating to criminal investigations, since other records are not currently being destroyed under the FBI's own moratoriums. See note 32 *supra*.

isfactory record-retention standards and procedures are established would not impose an injury on defendants outweighing the harm done to plaintiffs from a failure to grant relief.

That leaves for consideration the public interest. Congress has determined that federal record-keeping shall accommodate not only the operational and administrative needs of the particular agencies but also the right of the people of this nation to know what their government has been doing.[34] The thrust of the laws Congress has enacted is that governmental records belong to the American people and should be accessible to them—barring security and privacy considerations—for legitimate historical and other research purposes. The thrust of the actions of the FBI, perhaps naturally so, has been to preserve what is necessary or useful for its operations. The Archives, which should have safeguarded the interests of both the FBI and the public, in practice considered only the former.

Yet the congressional mandate has special relevancy to the Federal Bureau of Investigation. Its files, perhaps more than those of any other agency, constitute a significant repository of the record of the recent history of this nation, and they represent the work product of an organization that has touched the lives of countless Americans. Many of these have been in public life, others have achieved fame or notoriety of a different sort, still others have merely been the subject of routine investigations (security checks, suspected criminality, or inquiries into background or character). The files of such an agency contain far more of the raw materials of history and research and far more data

pertaining to the rights of citizens than do the files of bureaus with more pedestrian mandates. The public interest demands that great care be taken before such records are committed to destruction.[35]

According to the statutory mandate, basic decisions concerning the preservation and destruction of government documents are to be made by the impartial professionals of the Archives. The evidence shows that this mandate is not being carried out, and the public interest demands the entry of a court order halting further destructions until a plan has been devised that meets the congressional directive.

The grant of such relief will serve not merely the technical function of compelling compliance with the various records management laws; it will guarantee that records will not be destroyed until qualified historians and archivists have had a chance to sort them out so as to ascertain which ones are of genuine historical value and which ones may be disposed of without damage to anyone.[36]

Some, or many, of the FBI's records presently destined for disposal deserve to be preserved, not only for the benefit of plaintiffs and others like them but as part of the national heritage. George Santayana taught us that "those who cannot remember the past are condemned to repeat it." The lessons of history can hardly be learned if the historical record is allowed to vanish.

## VI

It is obviously impossible to identify with precision every document which may at some time in the future be of interest to a scholar, journalist, historian, or other person with a legitimate claim to access. But

---

**34.** Hence the direction in the law requiring the preservation of documents having historical or research value and those which are needed for the protection of the legal rights of citizens. The Freedom of Information Act is related to those interests and serves similar purposes.

**35.** The testimony of the government witnesses reveals no awareness that more exacting preservation standards might be in order when dealing with records of, say, the FBI, the Department of State, or the White House than

with the accumulated files of the Bureau of Fisheries and Wildlife or those of the Bureau of Reclamation and Irrigation. Indeed, judging by the failure of the archival authorities ever to view the FBI's records, they may have applied less rigorous standard to that organization than to other governmental departments.

**36.** The preservation of valuable historical records is of course important not only to these plaintiffs but to the public in general.

it is not impossible to identify in broad terms what records are likely to be of such value, nor should it be impossible to do so in a way that does not amount for a forfeit of the statutory responsibility of the Archives. That agency might, for example, designate those categories of records within the FBI's classification system which have obvious historical value, for preservation *in toto*.[37] With respect to other categories, records might be preserved on a more selective basis.[38] Still other categories of records might be marked for disposal after Archives personnel become convinced, following a personal inspection of typical files, that they lack special historical or other value.[39]

█ The precise means for achieving an adequate record retention system cannot be prescribed by the Court nor should its formulation, as in the past, be left essentially to the FBI. Under the law, it is the Archivist who is charged with the responsibility for the records preservation program of the United States. He and his staff, or other professionals retained on a consulting basis, must, in the first instance, establish an appropriate program. The individuals engaged in this work should be familiar with the historical context in which the documents were generated, they should be conversant with current and expected demands for records for legitimate purposes, and they should understand the FBI's method of operation and its system of keeping records. Needless to say, these persons should have access to the FBI's files.[40]

█ A preliminary injunction issued this date requires the Archivist and his staff, with the assistance of the FBI, to formulate a retention plan for FBI records meeting the statutory standard as interpreted herein, and it requires the FBI to formulate records control schedules consistently with that plan. The plan and the schedules should be submitted to the Court for its approval within ninety days hereof. In any event, until such submission has been made, any further destruction of FBI records will have to be halted, and the injunction so provides. Upon approval by the Court of the plan and schedules, that injunction will be lifted.

37. *E. g.*, documents classified under "Atomic Energy Act—Criminal," "Overthrow or Destruction of the Government," and "Foreign Police Cooperation."

38. *E. g.*, in such classifications as "Selective Service Act" and "Obstruction of Justice" only records relating to electronic surveillance, to relationship to demonstrations, or to individuals who achieved notoriety, might be retained.

39. *E. g.*, "Theft from Interstate Shipment" or "Mail Fraud."

40. Such employees would, of course, have to meet appropriate security standards.